IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

SCHUMAN AVIATION COMPANY LTD, )    CIVIL NO. 08-00289 SOM/BMK
dba MAKANI KAI HELICOPTERS, )
                           )    ORDER GRANTING SUMMARY
       Plaintiff and      )    JUDGMENT IN FAVOR OF THE
       Counterclaim       )    UNITED STATES
       Defendant,         )
                            )
    vs.                      )
                            )
UNITED STATES OF AMERICA,     )
                            )
       Defendant and      )
       Counterclaim       )
       Plaintiff.        )
_____ )

ORDER GRANTING SUMMARY JUDGMENT
IN FAVOR OF THE UNITED STATES

I.       INTRODUCTION.

       Plaintiff Schuman Aviation Company Ltd, doing business
as Makani Kai Helicopters ("Schuman Aviation"), challenges the
Government's imposition of the Air Transportation Excise Tax (the
"Air Transportation Tax") on Schuman Aviation's air tour
operations for the periods ending September 30, 2003, December
31, 2003, September 30, 2004, and December 31, 2004.  Schuman
Aviation argues that its air tours were exempt from the tax
because the tours were provided by small aircraft that did not
"operate on an established line," as contemplated by the relevant
portion of the Internal Revenue Code.  The court now resolves the
parties' dueling motions for summary judgment in favor of the
Government.

II.      FACTUAL AND PROCEDURAL BACKGROUND.

          A.    Schuman Aviation's Air Charter Business.

          Schuman Aviation, which is owned by Gustav Richard

Schuman ("Richard Schuman"), provides various types of helicopter

charters in Hawaii through its d/b/a, Makani Kai Helicopters.

United States' Concise Stmt. Mat'l Facts Supp. Mot. Summ. J.

("Gov't Facts") No. 9;[1] Decl. Jeremy Hendon ("Hendon Decl.") Exh.

---

[1]     The court has reviewed the parties' responses to each
other's concise statement of facts in support of the dueling
motions for summary judgment. See ECF Nos. 47, 50.  For facts
over which a dispute exists, this order reflects the relevant
evidence submitted by both sides.  The court notes, however, that
Schuman Aviation failed to submit much of its evidence in
admissible form.  Motions for summary judgment must be supported
by authenticated and otherwise admissible evidence.  See Orr v.
Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002).  The
court is aware that when only the form of what would otherwise be
admissible evidence is improper, the evidence may be considered.
See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).
Here, however, the court has no basis for concluding that what
Schuman Aviation submits would be otherwise admissible.  That is,
the authenticity of the materials is unclear.  None of the
documents submitted as exhibits to Schuman Aviation's Concise
Statement of Facts in support of its own motion for summary
judgment or in opposition to the Government's motion for summary
judgment is supported by any declaration or affidavit.  See ECF
Nos. 43, 50, 52.  Furthermore, the majority of the exhibits are
not self-authenticating documents (including the various computer
printouts of depositions, which lack the reporter's certification
and which include pages different from those in the Government's
submitted portions).  The court is not granting summary judgment
in Schuman Aviation's favor for other reasons, but notes that,
even if it were inclined to do so, it would likely be unable to
consider much of this evidence.  See, e.g., Orr, 285 F.3d at 773-
77 (holding that various depositions and other documents were
properly excluded from consideration on motion for summary
judgment because documents were not authenticated); Canada v.
Blain's Helicopters, Inc., 831 F.2d 920, 925-26 (9th Cir. 1987)
(unauthenticated fuel invoices could not be considered on motion
for summary judgment, despite being highly probative).

14 (Depo. Gustav Richard Schuman ("R. Schuman Depo.")) at 23-27;
id. Exh. 16 (Depo. Charles Anthony Lanza, III ("Lanza Depo.")) at
17.  Schuman Aviation's Air Carrier Certificate, issued by the
Federal Aviation Administration ("FAA"), authorizes Schuman
Aviation to conduct "on-demand" air transportation.  See Schuman
Aviation's Concise Stmt. Facts ("Schuman Aviation Facts") No. 1 &
Exh. 10.

    In 2003 and 2004, Schuman Aviation offered, among other
services, four air tours: the Holoholo Tour, the Pali Makani
Tour, the Sacred Falls Ali'i Tour, and the Night Tour.  Gov't
Fact No. 10; Hendon Decl. Exh. 7 ("Form 886A - Explanation of
Items") at 1-2 (tour descriptions).  During the period at issue,
Schuman Aviation offered a night tour with dinner for a total
price of approximately $125.  Schuman Aviation Facts Exh. 4 (R.
Schuman Depo.) at 190-91.  These tours were designed by Schuman
Aviation employees.  Gov't Fact No. 15.  Each tour flew over a
particular set of sights on the island of Oahu and had a set
duration.  See Form 886A - Explanation of Items at 1-2; Hendon
Decl. Exh. 14 (R. Schuman Depo.) at 77-78 (confirming that the
IRS descriptions of the tours were correct as to the sights
covered by the tours and their duration); id. Exh. 15 (Depo.
Diane Schuman ("D. Schuman Depo.")) at 28-30 (same).  For
example, the Holoholo Tour lasted for 20 minutes and was
advertised as follows:

> Let the magical island of Oahu embrace you as
> you soar over Keehi Lagoon thru Honolulu
> Harbor past the historical Aloha Tower, Aloha
> Tower Market Place and downtown Honolulu.
> Continuing on past Kewalo Basin, Ala Moana
> Shopping Center, Magic Island, Ala Wai Yacht
> Harbor (where Gilligan and the Minnow
> departed for their three-hour tour), Hilton
> Hawaiian Village, Sheraton Waikiki, Royal
> Hawaiian Hotel, and the Moana Surfrider (the
> oldest hotel built in 1901).  Fly past
> Diamond Head Crater (one of the worlds most
> recognized landmarks) Punchbowl National
> Cemetary, and Tripler Army Hospital.  This
> tour concludes at Pearl Harbor where you will
> see the USS Arizona, USS Missouri, USS Utah,
> and returning to Honolulu International
> Airport.

Form 886A - Explanation of Items at 1-2.

These tours were sold through third-party vendors, such as travel agencies, hotels, and concierge desks, as well as through direct telephone and walk-up sales.  See Gov't Fact No. 21; Schuman Aviation Facts No. 17.  The tours had advertised prices.  See Form 886A - Explanation of Items at 1-2; Hendon Decl. Exh. 14 (R. Schuman Depo.) at 78 (confirming that the IRS descriptions of the tours were correct as to the prices); id. Exh. 15 (D. Schuman Depo.) at 28-30 (same).  However, according to Richard Schuman, passengers booking through a third party paid whatever the vendor decided to charge.  Schuman Aviation Fact No. 18; Schuman Aviation Facts Exh. 4 (R. Schuman Depo.) at 97-98. Schuman Aviation offered ground transportation to ferry passengers from their hotels to the heliport, but charged the

same tour price whether the passengers were picked up or drove themselves. Schuman Aviation Facts Exh. 4 (R. Schuman Depo.) at 155-56.

Based on tour reservations, Schuman Aviation made a work schedule for its pilots, typically giving pilots one day's advance notice. Gov't Fact No. 23.

According to Richard Schuman and Charles Lanza, Makani Kai Helicopters Operations Manager, when it was possible to do so, Schuman Aviation attempted to combine passenger bookings to maximize the number of people on a helicopter, up to a maximum of six passengers per air tour. Hendon Decl. Exh. 14 (R. Schuman Depo.) at 120-21; id. Exh. 16 (Lanza Depo.) at 12, 37, 39-41. Schuman and Lanza testified that, when combining bookings, Schuman Aviation offered customers "upgrades" to a longer air tour. Id. Exh. 14 (R. Schuman Depo.) at 120-21; id. Exh. 16 (Lanza Depo.) at 39-41.

The four tours departed from and returned to the same location, Schuman Aviation's heliport. Gov't Fact No. 16. Schuman Aviation flew some combination of the four tours more than 6.5 times per day on average during the tax periods at issue, excluding Thanksgiving and Christmas. Gov't Fact No. 18. The aircraft used by Schuman Aviation for its air tours each had a maximum certified takeoff weight of less than 6,000 pounds. Gov't Fact No. 29.

Richard Schuman testified that portions of flight routes are controlled by air traffic controllers, under the purview of the FAA. Schuman Aviation Concise Stmt. Facts Opp. Gov't Mot. Summ. J. ("Schuman Aviation Resp.") Exh. 1 (R. Schuman Depo.) at 86-89. For example, according to Schuman, the Holoholo Tour occurs entirely within an FAA-restricted area. Id. In other words, "they tell us how to get in and get out." Id. at 86. For air tours that operate partially outside of FAA airspace, Schuman testified that any deviations from the standard routes would primarily be caused by the weather. Id. at 88. Schuman testified that the pilot would have some flexibility to travel to an area not on the listed tour at a passenger's request or if something special occurred (for example, if whales were spotted offshore). Id. at 88. Schuman testified that the pilot would try to accommodate a customer request but that the decision was the pilot's. Id. Schuman testified that fuel constraints and other regulations regarding aircraft control forced the pilots to stick to planned flight times, even if routes were varied. Id. at 92-94.

One of Schuman Aviation's pilots testified that, if a tour was in the air and a passenger asked to see something that was not in the tour, the pilot could determine whether to accommodate the passenger, depending on whether the request would fit into the timeframe of the tour and was nearby in the routing.

Schuman Aviation Resp. Exh. 5 (Depo. Eiki Miyasato ("Miyasato Depo.")) at 85-86. Additionally, Schuman Aviation notes that the IRS, in its explanation of its reasons for assessing the Air Transportation Tax, states that "the actual flight may be altered due to safety considerations or reasonable customer requests." See Schuman Aviation Resp. Exh. 10 (Form 886A – Explanation of Items) at 2.

In addition to the air tours, Schuman Aviation offered chartered flights for photography, television and movie work, construction, weddings, utility line inspections, and other purposes. Schuman Aviation Resp. Exh. 4 (Lanza Depo.) at 17, 21-24. For example, for utility charter flights Schuman Aviation took technicians to the top of a ridge line, then picked up the technicians when their work was completed. Id. at 21. These flights were charged on an hourly basis. Hendon Decl. Exh. 15 (D. Schuman Depo.) at 25-28; id. Exh. 16 (Lanza Depo.) at 25-29; Schuman Aviation Resp. Exh. 5 (Miyasato Depo.) at 87-88. Lanza testified that the purchasers had exclusive use of the aircraft for the amount of time they bought and chose where to go. Hendon Decl. Exh. 16 (Lanza Depo.) at 25-26. For example, a customer chartering a flight on a per-hour basis could choose to fly to Maui. Id. at 29.

B. __Tax Assessment.__

On August 13, 2004, the IRS notified Schuman Aviation
that the IRS had audited Schuman Aviation and had determined that
the company owed the Air Transportation Tax for tax periods
ending on September 30, 2003, and December 31, 2003.  Form 886A –
Explanation of Items; Schuman Aviation Fact No. 23.  The IRS
assessed the Air Transportation Tax on the air tours Schuman
Aviation had conducted during those tax periods.  Gov't Fact No.
13.  The IRS did not assess the tax on the other flights offered
by Schuman Aviation, which the IRS deemed to be "pure charter
flights."  See id.

On September 10, 2004, Schuman Aviation responded to
the IRS's preliminary assessment with a protest letter.  Schuman
Aviation Resp. Exh. 8.

On July 17, 2006, the IRS assessed Schuman Aviation the
Air Transportation Tax for the 2003 periods.  See Hendon Decl.
Exh. 1-2 (Certificate of Assessments, Payments, and Other
Specified Matters ("Certificate of Assessments") for tax periods
ending September 30, 2003, and December 31, 2003).  The IRS
assessed taxes of $37,302 for the period ending September 30,
2003, and $32,243 for the period ending December 31, 2003.  Id.
Exhs. 1-2.

Schuman Aviation paid a small portion of the Air
Transportation Tax for the periods ending September 30, 2003, and

8

December 31, 2003.  Schuman Aviation Resp. Exh. 10.  It paid the

entire Air Transportation Tax for the periods ending September

30, 2004, and December 31, 2004.[2]  Hendon Decl. Exhs. 3-4

(Certificate of Assessments for tax periods ending September 30,

2004, and December 31, 2004); Decl. Clara Yee ("Yee Decl.") ¶ 8,

ECF No. 40-29.

On August 21, 2006, the Government sent Schuman

Aviation Notices of Intent to Levy for the September 30, 2003,

and December 31, 2003, tax periods.  See Second Decl. Jeremy N.

Hendon ("Second Hendon Decl.") Exh. 1; ECF No. 48-1.  These

Notices stated that the IRS was charging late payment penalties

pursuant to 26 U.S.C. § 6651(a)(2).  See id.  The Notices

described the penalty as 1/2 percent of unpaid tax, assessed for

each month or part month that Schuman Aviation failed to pay the

tax.  See id. at 2.

In November 2006, Schuman Aviation sought refunds of

the Air Transportation Taxes it had paid for the 2003 and 2004

time periods.  Schuman Aviation Facts Exhs. 1-2.  On July 18,

2007, its claims were denied.  Schuman Aviation Resp. Exh. 10.

The IRS assessed "failure to pay tax penalties" on

February 26, 2007, in the amount of $2,084.35; on February 25,

2008, in the amounts of $3,823.41 and $6,191.96; and on March 2,

---

[2]    The record does not indicate why only two quarters were
in issue each year.

2009, in the amounts of $2,071.01 and $2,025.80. Id. The Certificates of Assessment reflect that the IRS issued a "Statutory Notice of Balance Due" on each of those dates. Id.

The current total balance due for the tax period ending September 30, 2003, is approximately $57,079.85. Yee Decl. ¶ 5 & Exh. 1. The current total balance due for the tax period ending December 31, 2004, is approximately $57,734.31. Id. ¶ 6 & Exh. 2. These figures reflect the tax, accrued interest, and penalties calculated through June 30, 2011.

According to a court complaint included in Schuman Aviation's submission to this court, in 1986 the IRS assessed the Air Transportation Tax against a company called "Kenai Air of Hawaii, Inc." Schuman Aviation Resp. Exh. 8 at 45. Kenai Air sought a refund in federal court, alleging that it operated helicopters "which it charters for sightseeing, photography, rescue and other non-scheduled flights" and complaining that it was exempt from tax as a small aircraft operating on a nonestablished line. See id. Exh. 8 at 46, 49. Schuman Aviation also submitted a copy of the single-page judgment entered by the clerk in favor of Kenai Air on September 23, 1987. Id. Exh. 8 at 54. Schuman Aviation argues here that it should be treated like Kenai Air instead of being taxed. Schuman Aviation has never sought or obtained a private letter ruling from the IRS regarding

its liability to pay the Air Transportation Tax.  Gov't Fact No. 30.

III.     LEGAL STANDARD.

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court "the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp. Catrett, 477 U.S. 317, 323 (1986)); accord Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 987 (9th Cir. 2006).  "A fact is material if it could affect the outcome of the suit under the governing substantive law."  Miller, 454 F.3d at 987.  When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  Id. (quoting C.A.R. Transp. Brokerage

Co., Inc. v. Darden Restaurants, Inc., 213 F.3d 474, 480 (9th Cir. 2000)).  By contrast, when the nonmoving party bears the burden of proof on one or more issues at trial, the party moving for summary judgment may satisfy its burden with respect to those issues by pointing out to the court an absence of evidence from the non-moving party.  Miller, 454 F.3d at 987.

When the moving party meets its initial burden on a summary judgment motion, "[t]he burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Id.  The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial.  See Balint v. Carson City, Nev., 180 F.3d 1047, 1054 (9th Cir. 1999).  On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

Summary judgment may also be appropriate when a mixed question of fact and law involves undisputed underlying facts.  See EEOC v. UPS, 424 F.3d 1060, 1068 (9th Cir. 2005); Colacurcio v. City of Kent, 163 F.3d 545, 549 (9th Cir. 1998).

IV.     ANALYSIS.

        A.     Relevant Statutory Background.

        Chapter 33 of the Internal Revenue Code ("IRC") imposes

excise taxes on various facilities and services, including

transportation by air.   See 26 U.S.C. § 4261; see generally IRC

Subt. D, Ch. 33.  As relevant here, the IRC imposes a 7.5 percent

tax on any amount paid for taxable transportation, as well as a

tax of $3.00 per domestic segment of air transportation.   26

U.S.C. § 4261(a)-(b).  Other statutes exempt certain types of air

transportation from the tax, such as helicopters used in mining

or logging, air ambulances, air transportation for skydiving, and

seaplanes.  See id. § 4261(f)-(i).

        The IRC also exempts from these transportation taxes

"[s]mall aircraft on nonestablished lines."  Id. § 4281.  A

"small aircraft" is "an aircraft having a maximum certificated

takeoff weight of 6,000 pounds or less."  Id.  The statute

provides that small aircraft are not subject to tax, "except when

such aircraft is operated on an established line."[3]  Id.

_____

        [3]     Section 4281 was amended in 2005 to add the following
sentence, highly relevant to the current tax obligations of
Schuman Aviation:  "For purposes of this section, an aircraft
shall not be considered as operated on an established line at any
time during which such aircraft is being operated on a flight the
sole purpose of which is sightseeing."  However, this portion of
the statute took effect on September 30, 2005, after the time
period at issue in this case.  See Pub. L. 109-59, 119 Stat.
1144, 1953 (Aug. 10, 2005).  Unless stated otherwise, all
citations to the Internal Revenue Code and Treasury regulations
are to provisions in effect in 2003 and 2004.

The IRS regulations pertaining to air transportation excise taxes further specify:

> The term "operated on an established line" means operated with some degree of regularity between definite points.  It does not necessarily mean that strict regularity of schedule is maintained; that the full run is always made; that a particular route is followed; or that intermediate stops are restricted.  The term implies that the person rendering the service maintains and exercises control over the direction, route, time, number of passengers carried, etc.

26 C.F.R. § 49.4263-5(c); cf. id. § 49.0-1 (stating that the regulations in part 49 relate to IRC chapter 33 air transportation taxes).  Section 49.4263-5 explains that the exemption is designed to apply to "small aircraft of the type sometimes referred to as 'air taxis.'"  26 C.F.R. § 49.4263-5(a).

Other IRC provisions govern the means by which the tax is to be collected and paid.  The taxes imposed by § 4261 "shall be paid by the person making the payment subject to the tax."  26 U.S.C. § 4261(d).  However, § 4291 imposes a duty on "every person receiving any payment for facilities or services on which a tax is imposed upon the payor thereof" to collect the tax from the person making the payment.  See also 26 C.F.R. § 49.4291-1.  Moreover, if the tax "is not paid at the time payment for transportation is made," then the "tax shall be paid by the carrier providing the initial segment of such transportation."  26 U.S.C. § 4263(c).

14

There is no dispute in this case that Schuman Aviation operated "small aircraft" as provided for under the statute.  See Gov't Fact No. 29.  However, the parties strenuously disagree about whether the air tours "operated on an established line."

      B.    The Government Meets Its Initial Burden of Proving that Tax Is Owed.

The Government bears the initial burden of proving that federal taxes are owed.  See Palmer v. IRS, 116 F.3d 1309, 1312 (9th Cir. 1997).  "[D]eficiency determinations and assessments for unpaid taxes are normally entitled to a presumption of correctness so long as they are supported by a minimal factual foundation."  Id.; see also Oliver v. United States, 921 F.2d 916, 919-20 (9th Cir. 1990).  Generally, introducing a Certificate of Assessment establishes a prima facie case that the tax and the imposition of additions to the tax are correct. Oliver, 921 F.2d at 919; Delaney v. Comm'r, 743 F.2d 670, 672 (9th Cir. 1984); but cf. Huff v. United States, 10 F.3d 1440, 1445-46 (9th Cir. 1993) (holding that Certificates of Assessment did not establish that a tax was validly assessed when the taxpayer never received copies and the Certificates failed to list a date of assessment).  Unless the assessment is "without rational foundation or is arbitrary," the burden shifts to the taxpayer to show that the determination is incorrect.  Oliver, 921 F.2d at 919-20; Palmer, 116 F.3d at 1312; see also Hughes v. United States, 953 F.2d 531, 535, 540 (9th Cir. 1992).  "The

15

taxpayer bears the burden of showing that he or she meets every condition of a tax exemption or deduction." Davis v. Comm'r, 394 F.3d 1294, 1298 n.2 (9th Cir. 2005).

The Government has submitted Certificates of Assessment for the tax periods ending September 30, 2003, December 31, 2003, September 30, 2004, and December 31, 2004. See Hendon Decl. Exhs. 1-4. The Certificates of Assessments include tax penalties for the periods ending September 30, 2003, and December 31, 2003. See id. Exhs. 1-2. There is no evidence that the Certificates of Assessment are without rational foundation or are arbitrarily assessed. The court therefore finds that the Government has established a prima facie case that Schuman Aviation owed the Air Transportation Taxes and associated failure-to-pay penalties.

> C. Schuman Aviation Does Not Establish That Its Air Tours Are Exempted From the Tax on the Ground That They Involve Small Aircraft on Nonestablished Lines.

The parties agree that, to determine whether Schuman Aviation's air tours were operated on an established line, the court must apply the elements set forth in 26 C.F.R. § 49.4263-5(c). See Schuman Aviation's Mot. Summ. J. ("Schuman Aviation Mot.") 26, ECF No. 42; Gov't Mot. Summ. J. ("Gov't Mot.") 12, ECF No. 40. Under that regulation, an aircraft is operated on an established line if it is (1) operated with some degree of regularity (2) between definite points, and (3) "the person rendering the service maintains and exercises control over the

16

direction, route, time, number of passengers carried, etc." See
26 C.F.R. § 49.4263-5(c). Unless all three elements exist, the
small aircraft is not operated on an established line and is
therefore exempt from the Air Transportation Tax. See, e.g.,
Rev. Rul. 72-617, 1972-2 C.B. 580 (determining that a carrier did
not operate flights on an established line, even though the
flights were operated regularly between two cities, because the
carrier did not retain control over the flights as defined by
§ 49.4263-5(c)).

The regulation contemplates the application of the
exemption to "air taxis." See 26 C.F.R. § 49.4263-5(a) ("Amounts
paid for the transportation of persons on a small aircraft of the
type sometimes referred to as 'air taxis' shall be exempt from
the tax imposed under section 4261 . . . ."). The language
"operated on an established line" was taken from prior statutes
that imposed the same transportation tax on motor vehicle
transportation. See H.R. Rep. No. 85-481, at 48-49 (1957),
reprinted in 1958-3 C.B. 372, 419-20. In considering the small
aircraft exemption, one court has commented that the term "air
taxi" "suggests an airplane for hire, subject to the whims of a
particular customer. Except to the hiring customer, its route is
wholly unpredictable and unreliable." Lake Mead Air, Inc. v.
United States, 991 F. Supp. 1209, 1212 (D. Nev. 1997). The
parties appear to agree with this explanation. See Schuman

17

Aviation Mot. 27-28 (quoting <u>Lake Mead</u>); Gov't Mot. 15 (same).

Given this understanding, the court's focus is on whether the

flights are properly considered pure charters, operating solely

and entirely based on the demands of passengers, or whether the

air tours are sufficiently prepackaged such that they may not be

considered true "charter" flights.

> 1. Whether the Air Tours Were Operated Between
>    Definite Points.

The parties dispute whether the air tours were operated

between definite points. Schuman Aviation asserts that its air

tours were not operated on an established line because the "plain

meaning" of the term "between definite points" requires the tours

to "have taken off and landed at two predetermined, identifiable

locations." Schuman Aviation Mot. 32. Schuman Aviation argues

that because the tours are circular, both taking off from and

landing at the Schuman Aviation heliport, they do not satisfy

what Schuman Aviation terms the "Between Two Definite Points

Test." <u>Id.</u> The Government argues that because the

transportation began and ended at Schuman Aviation's heliport, it

was "between definite points." Gov't Mot. 18 (quoting <u>Temsco

Helicopters, Inc. v. United States</u>, 409 Fed. Appx. 64, 66 (9th

Cir. 2010));[4] <u>see also</u> Schuman Aviation Fact No. 14

---

[4] In asserting its entitlement to summary judgment, the
Government relies in part on <u>Temsco Helicopters, Inc. v. United
States</u>, 409 Fed. Appx. 64 (9th Cir. 2010). <u>See, e.g.</u>, Gov't Mot.
12; United States' Response to Schuman Aviation's Mot. Summ. J.

(acknowledging that the tours departed from and returned to the Schuman Aviation heliport).

The court concludes that the Government's position is correct. Schuman Aviation, which bears the burden of establishing its entitlement to the exemption, <u>Davis</u>, 394 F.3d at 1298 n.2, fails to explain why the plain meaning of the regulation requires the transportation to be between two different locations. It is true that the word "between" can mean "connecting spatially." American Heritage Dictionary 175 (4th ed. 2000). <u>Cf.</u> <u>Schindler Elevator Corp. v. United States ex rel. Kirk</u>, ___ U.S. ___, 131 S. Ct. 1885, 1891 (2011) (when a term is not defined in a statute, a court must look first to its ordinary meaning); <u>FCC v. AT & T Inc.</u>, ___ U.S. ___, 131 S. Ct. 1177, 1181-82 (2011) (relying on dictionary definitions of the term "personal" to derive the term's "ordinary meaning"). But it does not follow that a trip that begins and ends at the same point has nothing "between" the beginning and end. Schuman Aviation's

---

("Gov't Opp.") 6, 9, 12, 16, ECF No. 47. <u>Temsco</u> is not a published opinion. In this circuit, the parties may cite the case as persuasive (not controlling) authority for the court to consider. 9th Cir. R. 36-3; <u>see</u> <u>Animal Legal Def. Fund v. Veneman</u>, 490 F.3d 725, 733 (9th Cir. 2007) (en banc); <u>see, e.g.</u>, <u>United States v. Jaramillo-Ayala</u>, 526 F. Supp. 2d 1094, 1103 (S.D. Cal. 2007) (examining unpublished Ninth Circuit decision for "guidance" only). The court notes that, in keeping with a memorandum disposition, <u>Temsco</u> contains little explanation of its holdings. <u>See</u> 9th Cir. General Orders 4.3.a. (July 1, 2011). Accordingly, to the extent the facts of <u>Temsco</u> are analogous to the facts presented in this case, this court treats that case as persuasive but not controlling.

tours had a beginning point and an ending point, with miles flown between the beginning and the end.  Both the beginning and the end were "definite points," even if they were at the same location.  <u>Accord</u> <u>Lake Mead</u>, 991 F. Supp. at 1213 (holding that air tours that "started and ended at the same point without fail . . . were between definite points").

Indeed, Treasury Regulation § 49.4261-1, which bears the heading "Imposition of tax; in general," states, "If not otherwise exempt, a payment for continuous transportation beginning and ending at the same point is subject to the tax." <u>See</u> 26 C.F.R. § 49.4261-1(c).

Section 49.4261-1(c), of course, is not by itself dispositive of the issue before the court.  Continuous transportation is not subject to the tax if it is "otherwise exempt."  Section 49.4263-5 is one of those exemptions.  <u>See</u> 26 C.F.R. § 49.4263-5(a) ("Amounts paid for the transportation of persons on a small aircraft of the type sometimes referred to as 'air taxis' shall be exempt from the tax imposed under section 4261 . . . ."); <u>cf.</u> 26 C.F.R. §§ 49.4263-1 to 49.4263-4, 49.4263-6 (providing exemptions to the transportation tax for commutation tickets, charges less than $.60, transportation furnished to the Red Cross and similar organizations, transportation of members of the armed forces, and certain transportation beginning before November 16, 1962).  Therefore, the court must decide first

whether the continuous transportation is exempt under § 49.4263-5 (or one of the other exemptions), and, if it is not, then it is subject to tax, even if the transportation is circular. That is, under § 49.4261-1(c), the transportation tax is not restricted to trips between two different points, but that in no way makes all continuous transportation taxable.

Schuman Aviation has the burden of establishing that its tours fall within an exemption. Neither the language of any exemption nor any other authority cited by Schuman Aviation provides that its tours were exempt simply because they were circular. In the absence of an applicable exemption, the court concludes that the air tours were operated "between definite points."[5]

---

[5] Normally, an agency's interpretation of its regulation is controlling unless the interpretation is "plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997). See, e.g., Polm Family Foundation, Inc. v. United States, 644 F.3d 406, 409 (D.C. Cir. 2011) (according Auer deference to IRS interpretation of a Treasury Regulation regarding a tax exemption); but cf. Robinson Knife Mfg. Co. v. Comm'r, 600 F.3d 121, 134 n.11 (2d Cir. 2010) (suggesting in dicta that Auer deference may not apply to tax cases). The court need not decide whether to defer to the IRS interpretation of Treasury Regulation § 49.4263-5, including its interpretation of the term "between definite points," because the Government's briefing nowhere requests Auer deference. Had such deference been sought, the court would have had to consider whether the requirements of Auer had been met, including the requirement that the IRS have maintained a consistent position with respect to its interpretation of this regulation. Cf. Schuman Aviation Mot. 23 (arguing that the IRS previously interpreted § 49.4263-5 "favorably towards air tour operators"); Callaway v. Comm'r, 231 F.3d 106, 132-33 (2d Cir. 2000) (declining to defer to the IRS's litigating position because the IRS had adopted inconsistent

2.      Whether the Air Tours Were Operated With Some
        Degree of Regularity.

Moreover, Schuman Aviation fails to demonstrate that
its air tours were not operated "with some degree of regularity."
It acknowledges that each tour began at the heliport and ended at
the heliport.  There is no evidence in the record that Schuman
Aviation was open to beginning or ending a tour at any other
point.  Furthermore, Schuman Aviation averaged more than six
tours a day, all leaving from and returning to the same heliport,
during the time period at issue.

Nevertheless, Schuman Aviation argues that there can be
some degree of regularity only when the transporter operates on a
set schedule that is in no way determined by customer demand.
Schuman Aviation Mot. 27-28 (citing Lake Mead, 991 F. Supp. at
1212, Rev. Rul. 72-617, 1972-2 C.B. 580, IRS Tech. Adv. Mem.
8135017 (May 19, 1981), and IRS Tech. Adv. Mem. 7731042 (May 9,
1977)).[6]  Regardless of the daily average number of tours,

_____

positions before, during, and after litigation with respect to
the meaning of the Treasury Regulation at issue).  In any event,
the court's agreement with the Government's interpretation of the
various provisions of § 49.4263-5, including the meaning of
"between definite points," while consistent with deference to the
IRS, does not result from any deference.

        [6]     Thus, at the hearing on this matter, counsel for
Schuman Aviation maintained that an aircraft operating based on
an advertised schedule of a morning and afternoon tour each day,
running between a single starting point and one of three or four
destinations, would not be operating with "some degree of
regularity."

22

Schuman Aviation argues, the air tours were not operated with sufficient regularity because a tour was only held if there was at least one scheduled passenger.

Under Schuman Aviation's view, for an aircraft to be operated with "some degree of regularity," there would have to be a strict schedule, set by the operator, that never varied based on customer demand. This cannot be the test. The regulation itself explains that "some degree of regularity . . . does not necessarily mean that strict regularity of schedule is maintained." 26 C.F.R. § 49.4263-5(c). Nor do Schuman Aviation's cited authorities support such a broad definition of "some degree of regularity."

In <u>Lake Mead</u>, the District of Nevada held that an air tour company that operated regular scenic tours around the Grand Canyon operated on an established line. 991 F. Supp. at 1213. In considering the language of Treasury Regulation § 49.4263-5(a), the court interpreted the term "some degree of regularity" to require that both the frequency of the flights and the control over the flights not be wholly determined by the customer. Although the air tour operator ran its tours only when there were customer bookings, the court noted that the plaintiff "regularly flew over the Grand Canyon," both at the request of a particular tour company and via bookings by other customers not related to the tour company. <u>Id.</u> Moreover, noting that the air tour

operator declined to fly to the Grand Canyon's south rim when such a route was requested, the court determined that the operator's "flights were not completely contingent upon customer demand." Id. Therefore, the court held, the air tour operator met the "some degree of regularity" requirement. Id.

In Revenue Ruling 72-617, the IRS determined that an aircraft operator that transported mail between two cities pursuant to a contract with the Postal Service was exempt from the tax on transportation of property by air because it was not "operated on an established line." The Revenue Ruling held that, because the contract gave the Postal Service control over the direction, route, time, and cargo carried, it constituted a charter. Id. Furthermore, because the carrier did not otherwise serve the two cities regularly except for these charters, the charters did not constitute an established line. Id.[7]

Neither of these cases cited by Schuman Aviation stands for the proposition that Schuman Aviation's air tours were not operated with some degree of regularity. The air tour operator in Lake Mead, like Schuman Aviation, ran its tours only when

---

[7] The court's analysis does not consider the two IRS Technical Advice Memoranda cited by Schuman Aviation in this or other portions of its motion, see Schuman Aviation Mot. 23, 27, because the Internal Revenue Code does not permit a Technical Advice Memorandum to be used or cited as precedent by a taxpayer other than the taxpayer to whom the memorandum was issued. See 26 U.S.C. § 6110(k)(3); Lucky Stores, Inc. & Subsidiaries v. Comm'r, 153 F.3d 964, 966 n.5 (9th Cir. 1998).

there was a passenger booking.  Nevertheless, the court determined that the flights were operated regularly.  991 F. Supp. at 1213.  And, unlike the mail carrier's chartered flights on behalf of the Postal Service, Schuman Aviation is not seeking to exclude from the Air Transportation Tax a particular customer or charter, without whose business it would not have conducted the air tours at issue.  Rather, Schuman Aviation seeks to extend the reasoning of Revenue Ruling 72-617 to exclude all of its air tours, even though Schuman Aviation operated the tours several times a day, on the premise that no regular schedule existed as to any portion of its customer base.

This is unpersuasive.  In keeping with relevant authority, this court looks at the actual practice of the transporter to determine whether the transportation was operated with some degree of regularity.  In Lake Mead, as discussed above, the court held that the Grand Canyon tours ran "regularly," even though each tour itself was considered a charter.  991 F. Supp. at 1213.  In Gray Line Co. v. Granquist, 237 F.2d 390 (9th Cir. 1956), the Ninth Circuit examined whether a limousine service's operations between downtown Portland and the Portland airport were "operated on an established line" such that the service was not exempt from a transportation tax under the provisions of an analogous IRC statute exempting certain ground transportation.  Id. at 393.  The Ninth Circuit held that

the car service's operation of 800 trips over the month at issue constituted sufficient regularity to fall under the definition of "operated on an established line."  Id. at 394; see also Rev. Rul. 72-617 (acknowledging that the mail carrier's flights for the Postal Service, which flew six times per week, "meet the regularity requirement of the regulations").  But cf. Northstar Trekking LLC v. United States, 637 F. Supp. 2d 676, 680-81 (D. Alaska 2009) (because cruise lines were responsible for 90 percent of air tour operator's business and "dictate[d] the duration, destination, and general route of the flights," air tours of glaciers that "operated frequently during the summer tourist season" were not "operated with some degree of regularity").

     The court agrees that operating a substantial number of flights does not, standing alone, establish that the flights are operated regularly such that they constitute an established line. A popular taxi service might make many trips on a given day. What the regulation gives significance to is rather the degree of regularity between definite points.  In this case, the air tours departed and returned to the same heliport more than six times each day during the relevant time period.  Even if the departure times and return times were not exactly the same every day, Schuman Aviation ran its tours with sufficient regularity that prospective passengers could be assured that, barring unusual

circumstances, Schuman Aviation would fly multiple tours every day.  The time variations appear to have usually been within a number of hours, not a number of days or some other interval that would have made it difficult for passengers to know if tours were available.  Given the facts in the record, this court concludes that Schuman Aviation's tours were operated "with some degree of regularity between definite points."  <u>See</u> 26 C.F.R. § 49.4263-5(c).

### 3.   Schuman Aviation's Control.

The final element is the degree of control Schuman Aviation exercised over the flights.  The record establishes that Schuman Aviation's control over the air tours was sufficient to render its tours on an established line.

The regulation in issue provides that the aircraft is operated on an established line only if "the person rendering the service maintains and exercises control over the direction, route, time, number of passengers carried, etc."  26 C.F.R. § 49.4263-5(c).  Thus, in Revenue Ruling 72-617, the IRS determined that in its contract with the Postal Service a carrier relinquished its control over the direction of travel, the route, the time of travel, and the cargo carried.  Because the customer, rather than the carrier, retained control over all of these aspects of travel, the flights were properly considered aircraft charters.  <u>Id.</u>  By contrast, the <u>Lake Mead</u> court considered the

tour provider in that case to have "control" under § 49.4263-5(c) when the airline could decline to fly a particular route requested by a third-party tour provider. 991 F. Supp. at 1213. See also Temsco, 409 Fed. Appx. at 67 (tour company satisfied the control element because it decided "what tours to offer, when to schedule flights, the route to take, and where to land," as well as "the maximum number of passengers allowed and whether to cancel a flight for insufficient sales").

Many of the facts present in Lake Mead and Temsco are present here. Most significant to the court is Schuman Aviation's control over the air tours' route. Passengers on the air tours could not go wherever they pleased. Instead, the air tour routes were fixed by Schuman Aviation and were advertised as including particular sights. See Gov't Fact Nos. 10, 14-15; Form 886A - Explanation of Items at 1-2 (describing Holoholo Tour, Pali Makani Tour, Sacred Falls Ali'i Tour, and Night Tour); Hendon Decl. Exh. 14 (R. Schuman Depo.) at 78 (confirming that IRS descriptions of tours and prices were accurate); id. Exh. 15 (D. Schuman Depo.) at 28-29 (same). It stands to reason that a passenger booking the Holoholo Tour, which included, among other sights, Diamond Head crater, would arrive for the tour expecting that he or she would indeed see Diamond Head crater, as well as each of the other predetermined sights offered for that tour by Schuman Aviation.

The length of each trip was also predetermined by
Schuman Aviation, based on the particular air tour booked.  Form
886A - Explanation of Items at 1-2 (describing Holoholo Tour,
Pali Makani Tour, Sacred Falls Ali'i Tour, and Night Tour);
Hendon Decl. Exh. 14 (R. Schuman Depo.) at 78 (confirming that
IRS descriptions of tour durations were accurate); id. Exh. 15
(D. Schuman Depo.) at 28-29 (same).  Each pilot operated on a
work schedule that incorporated the tours booked for that day,
along with the tours' preset durations.  See Gov't Fact No. 23;
Hendon Decl. Exhs. 10-11.

The departure times were also subject to change by
Schuman Aviation.  To maximize the number of people occupying a
helicopter (up to six), Schuman Aviation combined tours, for
example by offering to upgrade passengers to longer tour times.
Hendon Decl. Exh. 14 (R. Schuman Depo.) at 120-21; id. Exh. 16
(Lanza Depo.) at 37, 39-41.  This suggests that Schuman Aviation
deliberately controlled the routes flown as a part of controlling
its costs.

Before the tour began, therefore, passenger control was
limited to selecting the flight from a list and working with
Schuman Aviation to set a mutually agreeable reservation time.
Furthermore, deposition testimony makes clear that, because of
fuel and other flying restrictions, passengers had little ability
to vary the route being flown once a helicopter was in the air.

<u>See</u> Schuman Aviation Resp. Exh. 1 (R. Schuman Depo.) at 87-89.
Schuman Aviation owner Richard Schuman testified that, for
portions of each flight (and indeed, for the entire Holoholo
tour), the FAA controlled the helicopters' routing. <u>Id.</u> at 86-
89. Schuman also testified that, although the customers could
request variations, the pilots had total control over whether to
grant the requests, and the pilots were always required to adhere
to the flying time that had been agreed on ahead of time. <u>Id.</u> at
88, 92-94.

Finally, unlike the Postal Service case, the present
case involves air tour passengers who bought seats on the
helicopter, not use of the entire aircraft. <u>Cf.</u> Rev. Rul. 72-
617. Air tour passengers did not have exclusive use of the
helicopter, and Schuman Aviation does not suggest that passengers
had any choice about which other passengers would take the
remaining open seats on their tour. Indeed, as a point of
comparison, the court notes that the Government did not seek to
tax under § 4281 the other types of charters operated by Schuman
Aviation, such as flights for photography, television and movie
work, construction, weddings, and utility line inspections. <u>See</u>
Gov't Fact Nos. 9, 13; Schuman Resp. to Gov't Fact No. 9. In
those types of flights, the customers usually paid an hourly rate
for exclusive use of the helicopter. The helicopter then took
the customers wherever they instructed, such as to the top of a

ridge line, or even to a neighbor island.  Hendon Decl. Exh. 15

(D. Schuman Depo.) at 25-28; id. Exh. 16 (Lanza Depo.) at 25-29;

Schuman Aviation Resp. Exh. 4 (Lanza Depo.) at 21; id. Exh. 5

(Miyasato Depo.) at 87-88.  Even if, like the air tours, these

"pure charter" flights left from the heliport and returned to the

heliport, the tours were in the hands of the passengers.  In

other words, unlike the air tours, these tours were designed by

passengers, not Schuman Aviation.  Cf. Rev. Rul. 72-617 (flights

between two cities considered "charters" because, inter alia,

Postal Service contracted for exclusive use of the aircraft

during specific times and determined the route flown).

Schuman Aviation's control over the route, time, and

number of passengers renders the air tours controlled by Schuman

Aviation under § 49.4263-5(c).

D.    Schuman Aviation Was Obligated to Collect the Tax.

Schuman Aviation argues that, even if it was subject to

the Air Transportation Tax, it was not obligated to collect the

tax in most instances because the tax is owed only by the

passengers or by the third-party tour companies that actually

sold tours to the passengers.  Schuman Aviation Mot. 32-33.  This

argument relies on outdated cases and ignores the 1997 amendments

to the IRC that imposed secondary liability on air carriers.  See

26 U.S.C. § 4263(c); Lake Mead, 991 F. Supp. at 1217-18

(explaining that, in 1997, § 4263(c) was "modified to impose

secondary liability on air carriers").[8]  As of 2003, 26 U.S.C.

§ 4263(c) provided:

> Payment of tax.--Where any tax imposed by
> section 4261 is not paid at the time payment
> for transportation is made, then, under
> regulations prescribed by the Secretary, to
> the extent that such tax is not collected
> under any other provision of this subchapter
> such tax shall be paid by the carrier
> providing the initial segment of such
> transportation which begins or ends in the
> United States.

As Schuman Aviation is, undeniably, the carrier, Schuman Aviation

was responsible for collecting the tax.  Accord Temsco, 409 Fed.

Appx. at 67 ("[Section] 4263(c) states a straightforward

requirement that, when the Transportation Tax is not collected,

the carrier for the first segment must pay it.").

> E.    Schuman Aviation Does Not Establish that the Tax
>       Calculation is Erroneous.

Schuman Aviation asserts that the Government's tax

calculation is erroneous because the calculation includes taxes

on nontransportation services such as the hotel shuttle provided

by Schuman Aviation and meals during the Night Tour.  Schuman

Aviation Mot. 34 (citing 26 C.F.R. § 49.4261-2(c)); Schuman

Aviation Opp. 31-35.  However, the court lacks jurisdiction to

consider this defense because Schuman Aviation failed to

---

[8]    Although counsel for Schuman Aviation served as counsel
for Lake Mead Air in the Lake Mead case, Schuman Aviation here
ignores the Lake Mead court's discussion of this exact issue.
See Schuman Aviation's Opp. to Gov't Mot. Summ. J. ("Schuman
Aviation Opp.") 21 n.7, ECF No. 49.

previously raise it before the IRS. Schuman Aviation in any event presents no evidence that its records separated ground transportation or meal services from transportation charges, or that, in the absence of such separation, it could quantify any nontransportation income that should not have been taxed.

> 1. The Court Lacks Jurisdiction to Consider This Defense.

The Government argues that Schuman Aviation has waived this argument because it failed to raise the argument to the IRS in its protest letter or claim for refund. <u>See</u> 26 C.F.R. § 301.6402-2(b)(1) (requiring taxpayer applying for refund to apprise the Commissioner, in detail, of the grounds upon which the refund is requested); <u>Quarty v. United States</u>, 170 F.3d 961, 972 (9th Cir. 1999) (holding that compliance with the notification requirements of 26 C.F.R. § 301.6402-2(b)(1) is a prerequisite to a court's subject matter jurisdiction over a subsequent claim for a refund). The regulatory requirement is intended to prevent surprise and to give the IRS adequate notice of the claim so that it can be investigated and resolved. <u>Boyd v. United States</u>, 762 F.2d 1369, 1371 (9th Cir. 1985).

Schuman Aviation responds by referring the court generally to its 43-page protest letter to the IRS and to its refund claims. <u>See</u> Schuman Aviation Opp. 33 (asserting that "[t]he Protest Letter set forth exactly the same arguments of which the Government now complains lack of notice"); <u>see</u> Schuman

Aviation Opp. Exh. 8 (protest letter), ECF No. 50. This is a violation of Local Rules.

A party seeking or opposing summary judgment is responsible for directing the court to the specific portions of the record that support its argument. LR56.1(c). As Local Rule 56.1(f) states, "[T]he court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties." In any event, at the hearing on these motions, counsel conceded that he could not locate in the protest letter any mention of Schuman Aviation's argument that the tax assessed erroneously included nontransportation amounts. The court, therefore, lacks jurisdiction to consider this argument. <u>Quarty</u>, 170 F.3d at 972.

> 2. Schuman Aviation Failed to Properly Separate
> <u>or Account for Transportation or Meals.</u>

Quite apart from the lack of notice to the IRS about alleged calculation errors, Schuman Aviation does not show that it has a right to challenge any tax on a nontransportation item. Although Treasury Regulation § 49.4261-2(c) permits exclusion of "charges for non-transportation services" from the tax base, the regulation also requires that, to be excludable, the charges must be "separable and [] shown in the exact amounts thereof in the records pertaining to the transportation charge." Schuman Aviation points to nothing in the record establishing that it separated such charges and showed the exact amount of the charges

34

in its records pertaining to transportation charges.  See Schuman

Aviation Mot. 34 (asserting, without citation, that "Makani Kai's

gross air tour revenue includes non-transportation costs"); see

also Schuman Aviation Resp. No. 27 & Exh. 3 (D. Schuman Depo.) at

16 (stating only that Schuman Aviation employed an accountant to

reconcile its yearly costs).

Indeed, the evidence submitted by Schuman Aviation

suggests that the charges for meals and transportation were not

separated.  Schuman Aviation's concise statement of facts says

that charges for ground transportation and meal services "were

included in the prices charged for the air tours."  Schuman

Aviation Fact No. 22.  Schuman Aviation refers the court to the

deposition of Richard Schuman, who testified that Schuman

Aviation charged the same tour price whether the passengers were

picked up or drove themselves, and Schuman Aviation offered a

night tour that included dinner for a total price of

approximately $125.  Schuman Aviation Facts Exh. 4 (R. Schuman

Depo.) at 155-56, 190-91.  To the extent Schuman Aviation's own

internal documentation reflects revenue attributed to meals, the

IRS did not include these revenues in its tax calculation.  See

Form 886A - Explanation of Items at 10 (proposed assessment);

Hendon Decl. Exh. 12 (chart of Schuman Aviation revenue items).

Thus, even assuming the issue were properly before this

court, the record would not support a ruling that the tax

calculations erroneously included nontransportation amounts, or that there was a genuine issue of material fact with respect to this issue.

F.    Schuman Aviation Owes Late Payment Penalties.

Schuman Aviation contests the assessment of penalties against it for the periods ending September 30, 2003, and December 31, 2003. Schuman Aviation Mot. 34-38. The court finds no impropriety in the assessment.

1.    Schuman Aviation Had Notice of the Assessment of Penalties.

Schuman Aviation argues that it received no notice that the Government was assessing penalties against it until the Government filed its Answer and Counterclaim. Schuman Aviation Mot. 35. According to Schuman Aviation, the Government's failure to include the penalties in its Preliminary Assessment of Claim for Refund violated Schuman Aviation's right to due process, as well as 26 U.S.C. § 6751(a), part of the Taxpayer Bill of Rights. Schuman Aviation Mot. 35.

However, Schuman Aviation provides neither evidence that the Government's answer provided the first notice of penalties, nor citation to any law indicating that the failure to provide notice of penalties prohibits the Government from ever collecting penalties. Cf. Gov't Opp. 23-24 (arguing that § 6751(a) does not provide a remedy to Schuman Aviation even if the Government neglected to provide Schuman Aviation notice of

the assessment of penalties).  Lacking evidence or law, the court disregards this argument.  Miller, 454 F.3d at 987.

By contrast, the Government submits evidence that it provided notice to Schuman Aviation that the Government was assessing penalties.  First, on August 21, 2006, the Government sent Schuman Aviation Notices of Intent to Levy for the tax periods ending September 30, 2003, and December 31, 2003.  See Second Hendon Decl. Exh. 1.  These Notices identified the penalties as late payment penalties, assessed pursuant to 26 U.S.C. § 6651(a)(2).  See id.  The Notices described the penalty as 1/2 percent of unpaid tax, assessed for each month or partial month that Schuman Aviation had failed to pay the tax.  See id. at 2.  Schuman Aviation itself produced these documents to the Government during discovery in this litigation.  Id. ¶ 3.

Second, the Certificates of Assessment indicate that the IRS assessed failure-to-pay penalties on February 26, 2007, February 25, 2008, and March 2, 2009, and that the IRS issued to Schuman Aviation statutory notices of balances due on those dates.  Hendon Decl. Exhs. 1-2.  The evidence before the court creates no genuine issue of material fact as to whether Schuman Aviation received notice of the late payment penalties assessed.

2.   Schuman Aviation Does Not Establish that Its
     Failure to Pay Was Due to Reasonable Cause
     Rather than Willful Neglect (26 U.S.C.
     §§ 6651(a)(2), 6672).

Schuman Aviation argues that the Government may not lawfully assess penalties against Schuman Aviation under either 26 U.S.C. § 6651(a)(2) or 26 U.S.C. § 6672 because Schuman Aviation had reasonable cause for its failure to pay the Air Transportation Tax.   Schuman Aviation Mot. 35-38.

The Government asserts that it is not assessing penalties under § 6672.  Gov't Opp. 26.  Instead, it is assessing penalties only under § 6651(a)(2).  Paragraph (2) of subsection 6651(a) provides that the penalty shall be imposed upon the taxpayer's failure to timely pay tax, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect."

The Treasury Regulations interpret "reasonable cause" under 26 U.S.C. § 6651 to mean that the taxpayer "exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he paid on the due date."  26 C.F.R. § 301.6651-1(c)(1).  It is Schuman Aviation's burden to establish that its failure to pay the penalty was "due to reasonable cause and not due to willful neglect."  See, e.g., Synergy Staffing, Inc. v. IRS, 323 F.3d 1157, 1160 (9th Cir.

2003) (holding that taxpayer failed to carry its burden of establishing reasonable cause).

Schuman Aviation argues that it had a genuine, good-faith belief that its air tours were not taxable transportation because it had paid a different type of tax, the Aviation Fuel Excise Tax, on its tours since the company's inception without objection from the IRS. Schuman Aviation Mot. 36-37. Schuman Aviation's Concise Statement of Facts states that it paid Aviation Fuel Excise Tax rather than the Air Transportation Excise tax for the disputed 2003 and 2004 periods. See Schuman Aviation Fact No. 21 & Exh. 3. However, Schuman Aviation fails to support this argument with any evidence. Schuman Aviation also contends that it believed the flights were not taxable based on "informed judgment, legal research and the advice of counsel." Schuman Aviation Mot. 36-37. Although there is some support in the caselaw for the proposition that it is reasonable for a taxpayer to rely on counsel's advice regarding matters of tax law, see, e.g., Baccei v. United States, 632 F.3d 1140, 1149 n.3 (9th Cir. 2011), Schuman Aviation is not entitled to the benefit of such a defense because it offers no evidence to support its assertions that it actually obtained such advice before the IRS notified it that taxes were owed.

By contrast, the Government points to deposition statements made by Richard Schuman suggesting that he consulted

with his attorneys regarding the propriety of paying the Air
Transportation Tax only after he had been contacted by the IRS
agents regarding the 2003 time periods, long after the tax itself
was due.  See Gov't Fact No. 28; Hendon Decl. Exh. 14 (R. Schuman
Depo.) at 212, 233-35.  On a motion for summary judgment, the
court is unable to rule in Schuman Aviation's favor on issues for
which Schuman Aviation bears the burden of proof based solely on
argument by Schuman Aviation's counsel.  See Miller, 454 F.3d at
987; Fed. R. Civ. P. 56(c)(1).

        Nor is Schuman Aviation entitled to rely on the
favorable judgment obtained by a different taxpayer, Kenai Air,
in 1987.  Aside from merely attaching the complaint and the
single-page judgment entered in the case, Schuman Aviation Resp.
Exh. 8 at 45-54, Schuman Aviation submits no evidence of the
basis of the judgment in favor of Kenai Air.  Nor does Schuman
Aviation offer admissible evidence indicating that Schuman
Aviation believed itself to be similarly situated to Kenai Air.
In short, Schuman Aviation fails to establish that it failed to
pay the Air Transportation Tax based on reasonable cause rather
than willful neglect.

                3.    Schuman Aviation Is Not Entitled to Avoid
                      Retroactive Application of the Air
                      Transportation Tax.

        Schuman Aviation argues briefly in its Reply that it is
"entitled" to have the Air Transportation Tax applied

prospectively, rather than retroactively. See Schuman Aviation
Reply Supp. Mot. Summ. J. 19-20, ECF No. 52. Schuman Aviation
cites 26 U.S.C. § 7805(b)(8), which gives the Secretary of the
Treasury discretion to apply its tax determinations
prospectively, and argues that the Government's interpretation of
Treasury Regulation § 49.4263-5 represents an extension of
existing law that the court should prevent the IRS from applying
retroactively.

Schuman Aviation has not established that it is
entitled to relief under § 7805(b). First, having not
established that it included this claim in its claim for refund,
Schuman Aviation is barred from raising it before this court.
See Quarty, 170 F.3d at 972. Moreover, even if Schuman Aviation
did raise this claim, § 7805(b)(8), by its plain language, merely
gives the IRS discretion to waive retroactive application of its
rulings. Schuman Aviation cites no law suggesting that this
court may order the IRS to exercise its discretion to apply an
otherwise valid tax law on only a prospective basis when Schuman
Aviation failed to obtain from the IRS any statement supporting
Schuman Aviation's reading of 26 U.S.C. § 4281 or 26 U.S.C.
§ 49.4263-5. See Gov't Fact No. 30; Fl. Power & Light Co. v.
United States, 375 F.3d 1119, 1125 (Fed. Cir. 2004) (holding that
taxpayer was not entitled to have tax law applied only
prospectively when taxpayer had not obtained a private letter

41

ruling from the IRS that supported the taxpayer's alternative understanding).

V.      CONCLUSION.

Although the court is not unsympathetic to Schuman Aviation's contention that it operated for several years without having been subject to the Air Transportation Tax and that another air tour company previously received a favorable court judgment after the IRS sought to assess the Air Transportation Tax, the record establishes that Schuman Aviation's air tours operated "on an established line" under the governing Treasury Regulation. Schuman Aviation is, therefore, subject to the Air Transportation Tax for the periods ending September 30, 2003, December 31, 2003, September 30, 2004, and December 31, 2004. Moreover, Schuman Aviation has failed to establish that it is entitled to a refund based on any of its asserted defenses. Schuman Aviation's motion for summary is therefore DENIED. The Government's motion for summary judgment is GRANTED. Schuman Aviation owes the outstanding taxes, penalties, and accrued interest assessed in the Government's Certificates of Assessment for the periods ending September 30, 2003, and December 31, 2003. Schuman Aviation is not entitled to a refund of Air Transportation Tax paid for the periods ending September 30, 2004, or December 31, 2004.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 6, 2011.



    /s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Schuman Aviation Company Ltd dba Makani Kai Helicopters v. United States; Civil No.
08-00289 SOM/BMK; ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF THE UNITED STATES.

43